Willis C Silverthorne, Esq.  SBN 38858
220 Bush Street, Suite 962
San Francisco, Ca. 94104
Telephone: (415) 781-0717


Attorney for: Mark Moses


IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| Mark Moses                                        ) | NO:  C- 12-05271 EDL |
| ) | |
| Plaintiffs,                    ) | FIRST AMENDED |
| ) | Complaint for Damages, |
| v.                      ) | Breach of Employment Agreement, |
| Innoprise Software Inc., Dennis Harward,    ) | Breach of Contract, Quantum |
| Ann Harward, Harward Investments, Inc.    ) | Meruit, Fraud, Violation of |
| Harris Systems USA, Inc. N. Harris    ) | UTFC, C. Civ. C. §3439 et.seq., |
| Computer Corporation, M.S. Govern Co.    ) | Imposition of Trust |
| ) | |
| and Does 1-20 inclusive,        ) | |
| Defendants.        ) | |
| _____        ) | |

COMES NOW PLAINTIFF, Mark Moses, an individual, who alleges the

follows as his complaint against the defendants herein:


1. Plaintiff is unaware or as yet has been unable to determine the names of

all the parties responsible in this matter and as such names them as Does under the

authority of C. Code Civ. Proc. §474.

2. It is Plaintiff's belief that all parties named herein, including those fictitiously named, are responsible to Plaintiff in some manner as asserted herein: and all said defendants did act as the agents of all other defendants and within the scope of their authority; all defendants did act in conspiracy and duplicity with each of the other defendants herein, and in joint venture and or partnership.

**Parties:**

3. The Plaintiff, Mark Moses, is an individual, who resides and has resided, at all pertinent times herein, in the State of California and the County of Alameda. (hereinafter Moses)

4. The Plaintiff alleges on information and belief that Defendant, Innoprise Software  Inc. was a Delaware corporation in 2003 and then again incorporated in Colorado in 2005 but has allowed its status to lapse and is suspended. (hereinafter Innoprise)

5. Defendant, Innoprise, was registered as doing business with the Secretary of State of California but that status is now deemed "forfeited".

6. Defendant, Innoprise, was registered as a foreign corporation doing business in the State of Colorado but its status is now "Delinquent".

7. At all times pertinent herein, Innoprise maintained a business office  in Pleasanton, California in the County of Alameda.

**2** | **Complaint**

8. The Defendant, Dennis Harward, is an individual, who was the president and chief operating officer of Innoprise and the owner of Defendant Harward Investments, Inc. (and all other related or so named Defendants including "Harward Investments"). (hereinafter Harward) Harward is a resident of Colorado. Also, Dennis Harward became a vice president of Harris Systems USA on April 20, 2011.

9. The Defendant, Ann Harward, is an individual, who, at all pertinent times, was the office and accounting manager of Innoprise. (hereinafter A. Harward) Ann Harward is believed to be a resident of Colorado.

10. Harward Investments Inc. was a corporation in the State of Florida which incorporated in 1999 but has allowed its status to be deemed "inactive" by the Florida Secretary of State and in 2006 there was an "Administrative Dissolution for Annual Report". (hereinafter Harward or Harward Investments) Harward Investments filed as a foreign corporation doing business in Colorado but had its status deemed "Delinquent" by the Secretary of State for Colorado as of 2009.

11. The Defendant, Harris Systems USA, Inc. is a Delaware corporation which is believed to be wholly owned by N. Harris Computer Corporation. (hereinafter Harris USA or Harris collectively) Harris and its related companies also owned, developed, leased, serviced and sold software of the same type and purpose as that of Innoprise and was involved in the same customer market.

12. The Defendant N. Harris Computer Corporation is believed to be a corporation which is wholly owned by Constellation Software Inc. and Copernic, Inc. (hereinafter N. Harris or "Harris" collectively) N. Harris has offices and operations throughout the United States and does business in California directly and through its wholly owned division M. S. Govern a sales and service company. N. Harris and Harris USA have become the successors in interest to Innoprise.

**Jurisdiction:**

13. This matter concerns the recovery of damages from a breach of employment contract and or breach of contract where the contract was made in California and was to be performed in California: the matter also involves acts of fraud which were perpetrated in California and caused damage in California and involves companies (H. Harris Computer Corporation, Harris Systems USA, Inc, M.S. Govern, and Innoprise) which do business in California.

**Venue:**

14. The Defendant Innoprise, at all times pertinent to this case, maintained a business office at 6200 Stoneridge Mall Road, Pleasanton in Alameda County; Innoprise had employees in Alameda County and contracted with the Plaintiff in Alameda County. N. Harris Software also has employees operating in the County of Alameda.

## General Allegations:

15. Innoprise is the designer, lessor and seller of software and software systems which are used by governmental and quasi governmental agencies for accounting, billing, payroll, operational and management purposes.

16. Innoprise's founder and chief executive officer is Dennis Harward.

17. In August of 2010 Plaintiff Mark Moses began working as a consultant for Innoprise. At that time Harward began discussions and negotiations for the employment of Mark Moses by Innoprise on a regular basis.

18. An oral agreement of employment between Innoprise and Mark Moses was reached and agreed upon. In this oral agreement Innoprise was to employ Mark Moses as a sales representative for California and the other Western United States. He was to be given a list or directory of target customers by Innoprise and he would be given support and backup help from the company office in Colorado.

19. This was an oral agreement of employment from Harward on behalf of Innoprise.

20. The oral employment agreement required that Mark Moses begin his employment at an office in Pleasanton, California as provided by Innoprise. Innoprise. Innoprise also provided telephone services, company computers, email accounts, and business cards identifying Moses as an employee/sales representative of Innoprise in California.

21. Under this agreement Mark Moses, as an employee, would receive a salary at the rate of $125 per hour up to and including $12,500.00 for a total of one hundred hours per month. Additionally, he would be reimbursed his expenses incurred in his work. However, should he fail to work the full one hundred hours

his salary would be decreased by $125 for each hour less than the 100 hours required.

22. The offer of employment was made by Harward to Mark Moses in California in mid-late August 2010 and was accepted in California. Mark Moses' employment began on September 1, 2010 in California.

23. Mark Moses was provided a company Employee Handbook and employee agreements regarding confidentiality and conflict of interest requirements and prohibitions and required to sign the various agreements on September 15, 2010. Innoprise provided Mark Moses with training material and sales and product literature in preparation of his employment.

24. Mark Moses' sales efforts were directed and supervised by Harward, A. Harward, and the national director of sales. As an employee Mark Moses was required to participate in weekly sales meetings and he was required to provided weekly sales reports on his own sales efforts and plans.

25. Under the agreement Mark Moses was to dedicate all his work and efforts to the employment and sales efforts for Innoprise and was not to be involved with competing products or sales or efforts which distracted him for this employment.

26. At no time during the course of the employment of Mark Moses did he receive a reprimand or criticism of his efforts or work.

27. Innoprise paid Mark Moses all expenses as reported by him throughout the course of employment and Innoprise paid Mark Moses for his consulting work for the month of August 2010.

28. Then in October 2010, Harward orally represented to Mark Moses that Innoprise was now experiencing cash flow problems and his salary for September would be delayed. Innoprise paid Mark Moses $8,500 of his September 2010 salary on January 27, 2011.

29. This same excuse of "cash flow problems" recurred many times from November 2010 through April 2012. It was orally represented to Moses by both Dennis Harward and Ann Harward every month when Moses submitted his statements for wages that there would be a short delay in payment.

30. The balance of the monthly salary for September in the amount of $4,000 was not paid until February 11, 2011. Also at that time Innoprise paid $5,000 toward October's salary. The remainder of the October salary was paid by Innoprise on March 15, 2011 in the amount of $7,500.

31. It is now Moses information and belief that the delay of salary was not unique to Mark Moses but was also occurring to several other employees who were employed in similar sales positions.

32. During the course of a conversation about salary in October 2010, A. Harward revealed to Mark Moses that she, the accounting manager, had not designated Mark Moses as an "employee" on the company's books and records

because this would cause some difficulty with certain of the company's investors. No further explanation of the reasoning or cause for this was ever given upon his requests.

33. Mark Moses put in his monthly sales and activities reports, expense reimbursement requests, and salary request from September 2010 through April 2011 on the basis of a salary of $12,500 per month. Moses was never told he would not be paid and there was never any question or rejection of the amount of his requests by Innoprise or any other defendant. Although concerned about the "cash flow" problem; Mark Moses was aware that the sales that he had pending would be more than adequate to cover the salary payments due him.

34. Then on April 28, 2011, Mark Moses was at the Innoprise office in Colorado and happened to see Harward in the hallway. At that time, Harward advised him that he was discussing the sale of the company with  an unidentified party. Harward told Mark Moses he did not need to worry about payment of his salary because it would be covered in the sales agreement and or paid by royalties.

35. The next day, April 29, 2011, Harward announced to Mark Moses that he had sold the company to N. Harris and Mark Moses needn't worry about what was owed to him because it would be paid. There was no further or specific explanation as to how that would be done.

36. In the conversation with Harward on April 29, Mark Moses was told that he was terminated but that he should contact the sales manager of M. S. Govern about a possible position with the new company. On May 2, 2011, Jeff Bender of

N. Harris announced that the company was happy to welcome all the Innoprise employees of Innoprise to the Harris company family. Next on May 16, 2011 Mark Moses was informed that by the sales manager of N. Harris that they were still working on matters and were uncertain if there was a position for Moses.

37. Innoprise, Harward and Harris executed an agreement dated April 29, 2011 in which Harris purchased from Innoprise all of its assest - save for a few items personal to Harward. The purchase included but is not limited to all the software and its designs, all the licenses for the software, all the contracts Innoprise had for the use of its software, all the service agreements Innoprise had with its customers and the customer list.

38. This purchase of assets from Innoprise and their transfer left Innoprise insolvent and devoid of any assets of any value whatsoever and insufficient assets with which to pay its obligations.

39. This purchase purports to be for $3,700,000 with sums withheld by Harris to pay contingencies. The owner of Innoprise, Harward, valued the business at something in excess of $25,000,000 based on its contracts and the cash flow to be generated from the software licenses and software service agreements which were part of the assets sold.

40. The agreement provided that Harris would withhold a portion of the $3,700,000 purchase price for payment for contingencies to third parties. Harward has stated that the $400,000 withheld has been paid to creditors of Innoprise and

**9** | **Complaint**

Harris has provided an accounting which Harward states he is unable to understand or reconcile or to produce to Moses.

41. Harward has stated that Harris represented that Harris would actively sell and market the Innoprise software and programs which would provide sales and royalties to Harward and Innoprise. Harris had represented that as a larger company with greater resources and manpower the sales would be greater and Harward and Innoprise could expect substantial royalties - providing Harward with a projection of $10,820,000 in royalties over a period of three to four years.

42. Harward has state in June 2013 that had tried to negotiate payment of all the creditors, including Moses, in the payment under the contract; but Harris expressly lead him to believe that he would be able to pay all creditors from the royalties which would surely be forthcoming. Harward stated that Harris had instructed him to pay Moses.

43. After the transfer of the assets and payment by Harris; Harris ceased efforts to sell and market the Innoprise software and thus limited the amount of royalties which would be payable under the April 29 contract.

44. The April 29 contract provides that royalties are due for the first three-four years only. Since the agreement Harward has been informed that employees of Harris had presented to their company board of directors a presentation and projection that there would be no royalties due from sales for the first three to four years. This effectively meant that the fund for payment of creditors never existed

and was not funded by royalties which were represented as a expectation by Harward.

45. At the time of the execution of the contract of April 29, Harris was aware that Harward, already a vice president of Harris as of April 20, was representing to creditors, such as Moses, that they would be paid out of the contract or royalties.

46. Since the salary payments for September 2010 and the payment for October 2010; there has never been a payment of salary made to Mark Moses as required under C. Labor C. §201 or penalty payment under L. Code §203 at any time.

47. On April 29, 2011, N. Harris and Harris USA entered into a written agreement with Innoprise, Dennis Harward and The Bridge Holders as Warrantors to purchase all the assets of Innoprise. (hereinafter The Agreement)

48. N. Harris, Harris USA and their agent, M.S. Govern, then integrated the employees of Innoprise (or some of them) into their various companies and began to operate their business and that of Innoprise as if there was a seamless transformation between the companies.

49. Per the Agreement Harris received all the business assets of Innoprise, namely the Innoprise software and design, the licenses for its use, the customer contracts for the use of the software, the customer contracts for maintenance of software, the customer "letters of intent" to purchase the use of the software with their good faith deposits, the customer list, and the sales information of past and

ongoing sales strategies and efforts. Harris had taken the entire business of Innoprise and continued to act in the capacity of a successor in interest - Innoprise under a new name per their admission in the press release and contrary to the claimed that the Agreement of April 29 was for "assets" Harris had purchased the going business of Innoprise was continuing its operations as confirmed in the Jeff Bender, Harris, press release of May 2011.

50. Harris then notified customers of Innoprise that the Innoprise contracts had been assigned to Harris and the customers should make payment to Harris and should deal with Harris.

51. The Purchase Agreement provides that the purchasers are buying all the assets, equipment (paragraph 2.1-2.2 therein) and only excluding from the purchase some items personal for the sellers such as life insurance on Harward, etc.

## First Cause of Action - Breach of Employment Agreement
### *Against Innoprise and Dennis Harward and Ann Harward*

52. Plaintiff incorporates all the allegations contained in paragraphs 1 - 51 as though those allegations are set forth herein.

53. Mark Moses was employed by Innoprise as an employee and was due the salary of $12,500 per month based upon his one hundred hours of work per month.

54. Innoprise failed to pay Mark Moses its employee his salary for the months of November and December 2010 and for January, February, March, April 2011 for the total sum due of $71,500.00.

55. Upon termination there was no payment or even an offer of payment of the wages then due: and, thus, the employee, Mark Moses, is entitled to an additional month's salary of $12,500 from May 1 to May 31, 2011 under the provisions of C. Labor C. §201, 203.

56. Mark Moses is also entitled to 10% interest on all unpaid balances under the provisions of C. Civ. C. §3289 and C. Labor C§1194.

57.  Additionally, Mark Moses is entitled to his attorneys fees and costs for the enforcement and collection of employees wages and an employment agreement under the authority of C. Labor C. §208.5, 26.88 et. seq.

58.  Defendants Harward and A. Harward in agreement with N. Harris and Harris USA advised Innoprise to show the employment status of Mark Moses as other than an employee to avoid the application of the law regarding employees and, as such, these defendants are personally and severally liable with Innoprise per C. Labor C. §2753.

Wherefore, Moses requests recover as set forth in the prayer herein.

**Complaint**

## Second Cause of Acton - Breach of Contract
### *Against Innoprise and Dennis Harward and Ann Harward*

59. Mark Moses incorporates by reference all the allegations contained in paragraphs 1 - 58 of this complaint as though they are stated herein.

60. About August 26, 2010, Harward on behalf of Innoprise orally contracted with Mark Moses to obtain and employee his work and efforts in sales of software products, systems and service of software systems on behalf of Innoprise. These sales efforts of Mark Moses were to be directed by Harward,  the Innoprise sales manager, and office manager A. Harward.

61. Mark Moses did so act and did expend all his efforts to obtain sales on behalf of Innoprise from September 1, 2010 until April 29, 2011.

62. Mark Moses completed and satisfied all the conditions of his contract with Harward and Innoprise.

63. Innoprise paid all of Mark Moses' expenses as submitted per this agreement and did pay the contract salary amount for services in September 2010 and on a delayed basis October. However, neither Innoprise or Harward have paid the contract price for services for the months of November, December 2010 and January, February, March and April 2011.

64. Harward and Innoprise are indebted under the contract for six months' payments in the total amount of $71,500.00.

65. Moses is also due statutory interest of 10% on this amount under C. Civ. C. §3289.

Wherefore, Moses request the relief set forth in the prayer herein.

### Third Cause of Action - Quantum Meriut
### *As Against the Harward and Harris Defendants*

66. Plaintiff incorporates by reference the allegations contained in paragraphs 1-65 of the complaint as though they were fully stated herein.

67. During the period of November 1, 2010 to April 29, 2011 Mark Moses provided services as a sales representative of software and software systems. Then in May 2011 at the specific request of Harward, was a vice president of the Harris defendants, Moses was directed to contact and continue sales efforts with certain customers with whom he had previously been working. At that time Moses was told he would be paid commissions on any contracts. This contact did result in a contract with the City of Flagstaff.  This request of A. Harward was all for the benefit of Harward, A Harward, Innoprise, N. Harris, and Harris USA Harward, at the time he instructed Mark Moses.  The final contract was on the same terms and basis which had been proposed and tentatively agreed upon by Flagstaff with Moses.

68. The services preformed were for the benefit and had a value to all these defendants. Plaintiff expected that he would be compensated for these services and this would further his opportunity for further employment and payment from

| Complaint

royalties. The services were not extended as a gratuity. The reasonable value of these services was set by their payment of similar services performed in the month of September 2010 in the amount of $12,500 for each month and or at the rate of $125.00 per hour: alternatively as a proportion of the commission due on such a contract sale which will be subject to proof at trial.

69. The defendants have failed and refuse to pay for these services rendered in the amount of $71,500.00 or addition commissions on the work with Flagstaff.

70. Mark Moses is also entitled to interest thereon at the statutory rate of 10%.

Wherefore, Plaintiff seeks relief as prayer herein.

### Fourth Cause of Action - Fraud
### As to Defendant Harward and group and Harris and group

71. Plaintiff incorporates by reference the allegations contained in paragraphs 1- 70 of the complaint as though they were fully stated herein.

72. In their pre-contract discussions in August 2010 both in person and telephonically, Harward represented to Moses that Innoprise was a financially strong and a viable company which met and could met its obligations as they came due and that Moses should have no further concerns of payment or the future of his employment by virtue of the viability of the company; further that Innoprise maintained itself in a business-like and honest manner. Harward represented that

Innoprise would hire Mark Moses as a sales representative and would pay to Moses a salary of $12,500.00 per month.

73.  In these discussion in August 2010, Harward represented that the company was engaged in lawful business and would need the services of Moses so long as he properly performed his job of sales.

74. Moses relied on this representations believing that he was being hired by a financially sound company which operated honestly, legally and did not violate laws in their business practices: as such, Moses did not take advantage or obtain other valuable and well paid employment and accepted the employment presented by Harward at Innoprise.

75. These representations of Harward to Moses were untrue. Harward did not inform Moses that  Innoprise was not financially sound and could not meet its current obligations as they became due, that he and others in Innoprise were looking for a sale and were  negotiating a sale of the business or seeking other rescue type financing which would mean that Moses' employment with Innoprise was not a issue of performance but one of economics as necessary to show a profit for the company in a sale, that the addition of Moses to the sales force was for the purpose of adding more sales and more potential sales, such as letters of intent, so that the company would be more salable and then Moses would be terminated upon sale of the company, Harward did not inform Moses that he and his wife were the only owners of Innoprise either directly or through entities they controlled: Harward did not tell Moses that the company suffered "cash flow" problems and they might not be able to pay him in a timely fashion.

| Complaint

76. In fact Harward and Innoprise throughout 2010 and prior thereto had been borrowing money to meet immediate obligations of the company, that Innoprise was behind in its payroll, owed the IRS approximately a million dollars in back taxes and payroll taxes, that prior to the execution of the April 29 purchase agreement Harward met with Harris and they discuss the termination of employees including Moses so that the Harris representatives could present a business model to the Harris board of directors which could show an immediate thirty percent profit.

77. Harward did not inform Moses that some of the business practices of Innoprise were illegal. Harward did not inform Mark Moses that he was being asked to make sales and make sales calls which required misrepresentations and were unlawful and in violation of trademark laws and copy right laws. This practice became the basis of a lawsuit by SunGard, a company which had previously purchased software from a company which involved Harward. This law suit involved Harward as an individual defendant and Harris as a defendant. This suit was threatened in the year of 2010 and, on information and belief, filed in December 2010 prior to the sale under the agreement of April 29, 2011. It is Moses information and belief that  these unlawful sales and sales calls were part of a scheme between Harward, A. Harward, Innoprise, N. Harris, Harris USA and part of the negotiations for the sale of the business of Innoprise. These improper sales practice lead to increase business to be shown on the books for the sale.

78. The lawsuit with SunGard was settled. It is Moses information and belief that Harris paid all or a part of this settlement which included a release of Harward as an individual defendant.

79. The defendants herein knew these representations were untrue; and were made with the intent to mislead Mark Moses and to cause Moses to agree to contract with the defendants. Harward and Innoprise never intended to pay Mark Moses his wages as an employee or under any agreement or contract.

80. Moses states on information and belief that Harris had a team of accountants perform a due diligence inspection of Innoprise and was aware of Innoprises' obligations and creditors, employees and contractors.

81. Innoprise, Harward and Harris do not define Moses as an employee but rather an independent contractor.

82. The obligation for Moses services is shown on the books and records of the company and would have to be evident in any due diligence audit.

83. It is Moses information and belief that Moses does not appear as an "employee" on the schedules of the April 29 agreement which was drafted by Harris because Harris and Harward purposely mis-defined Moses so that they would have a better package to show the Harris board of directors for agreement approval and to avoid payment of the obligation by not including payment in the purchase agreement and by diverting the funds to a wholly owned entity of the Harwards - Harward Investment Inc. (defunct in Colorado). This failure to include

Moses on the schedule in the agreement and the diversion of moneys for the payment of Innoprise obligations was intentional so far as known by them or to the extent that Harward was required to designate the payment of obligations. The payment to Harward Investment became an intentional act to avoid payment and fraud. The amount of the purchase was insufficient to cover the obligations of Innoprise which was known to Harris and thus Harris knew not all creditors would be paid. Harward admits that Harris told him to pay Moses out of the proceeds but Harris did not provide a means to have this done. As such it constructively defrauded Moses by not making payment, diverting the assets and their value and continuing the business of Innoprise without paying its bills.

84. Moses in informed and believes that the Agreement of April 29 was drafted solely by Harris.  Harward was not represented by counsel during the course of the negotiations or drafting of the Agreement.

85. Harward has admitted that Moses is owed his wages as requested. However, neither Harward or Harris intended to pay Moses what was owed in that the purchase price paid by Harris and they did not include payment to Moses. Harris permitted and cooperated in Harward diverting the payment from the rightful recipient Innoprise to a solely owned and controlled entity named Haward Investments, Inc. which was legally defunct at the time. By doing so Harward and Harris concealed and or diverted the money which should have gone to creditors: thus prevented payment.

86. Moses is informed and believes that as part of the April 29 agreement and payment on it, Harris withheld $400,000 from the purchase price which was to

be used to pay contingency obligations of Innoprise which they had not accounted for in their due diligence audit. Harris has refused to pay Moses claim as an acknowledged creditor of Innoprise.

87. The April 29 Agreement in Section 1.1 states specifically that Harris will pay ",,,the accured payroll..." of Innoprise. The obligation owed to Moses is such an obligation; but Harris refuses to pay. It is asserted that Moses was not an "employee" and listed on the Agreement schedule as such which is in furtherance of Defendants fraud.

89. At the time that Moses was told by Harward that he was terminated on April 29, 2011 Moses could have protected his interests by legal procedures. Moses did not do so because he was told by Harward, the president of Innoprise and now a vice president of Harris, that he, Moses, was to be paid out of the contract sales agreement or from royalties. This was false and neither Harward, Innoprise or Harris intended to pay him and he has not been paid.

90. Mark Moses asserts, on information and belief, that at the time Harward and Innoprise were contracting with Mark Moses and making these misrepresentations, they were negotiating the sale of the business to N. Harris and Harris USA and they had agreed that Innoprise should not carry or show any additional employees on the books and records for financing purposes, to create a better looking package to present to the Harris board of directors and that upon the sale of the assets of the company the proceeds could be diverted whereby Mark Moses and others similarly situated could be left without pay or recourse.

91. These representations and or withheld information was material to the decision of Moses and his acceptance of the employment agreement; and if known to Moses would have meant that he would not have accepted the offer of employment or accepted the request of May 2011 from Harward and Harris for work after April 29, 2011.

92. Moreover, it is plaintiff's information and belief that the defendants Harward, A. Harward, N. Harris, Harris USA, M.S. Govern all advised Innoprise to show Mark Moses as holding a position other than that of an employee to avoid the application of the employment laws of California. (C. Labor C. §2753, 2802, 2804, 2926)   As such said defendants are jointly and severally liable to Mark Moses.

93. Mark Moses reasonably relied on the representations and had no reason to believe that they were false in any way.

94. The misrepresentation of Harward and Innoprise and its falsity was known to them and to A. Harward, N. Harris, Harris USA, M. S. Govern. But N. Harris, Harris USA, and M. S. Govern did not reveal its falsity because they were to benefit from the work and efforts of Mark Moses and from the breach of the agreement to pay for these services.

95. The contract for the purchase of Innoprise by N. Harris and Harris USA provides that payment for the purchase to sellers, Innoprise, Harward and "Bridge Holders" (namely, John Connors, Harward Investments, Crusader Investments LLC) can be "... as otherwise directed in writing by seller...". (§2.4 The

Agreement) This agreement was drafted by Harris. By making this provision Harris either intentionally or constructively avoided payment of creditors.

96. Shortly after April 29, 2010, Harward orally represented to Mark Moses that Innoprise is no longer in operation and the Innoprise has no money to pay him. It is Moses information and belief that "seller" (as described in the preceding paragraph)  directed buyers N. Harris and Harris U.S.A. to pay the purchase money to Harward, A. Harward, Harward Investments, John Connors, and Crusader Investments LLC instead of Innoprise. Moreover, this representation is untrue in that Innoprises assets (money) was available to Harward. Also, Innoprise was still operating as evidenced in the press release by Jeff Bender the CEO of Harris. The release by Bender states that Harris has purchased Innoprise which "... will continue sell, develop, enhance...(and he then says)...welcomes the Innoprise employees and customers...to the Harris family...".

97. This diversion of the moneys which constituted the payment for the assets of Innoprise left the creditors and unpaid employees, such as Mark Moses, without payment or a source for payment.

98. As a result of this deceit by these defendants, Moses has been damaged in the amount of $71,500 on his original employment contract and commissions on the May 2011 employment plus penalty payment under C. Labor C. §201, 203 in the amount of $12,500.

| Complaint

99. Mark Moses is also entitled to exemplary damages in that these acts of defendant were intentional, malicious and intended to defraud, harass and oppress Plaintiff. The Complaint will be amended at trial for the amount claimed.

100. Additionally, Moses is entitled to statutory interest on the amount due from April 29, 2011 to date under C. Civ. C. §3289 and C. Labor C. §1194.

Plaintiff seeks relief as prayed herein.

### Fifth Cause of Action - Transfer in Fraud of Creditor
### as to the Harward Defendants and the Harris Defendants

101**.** Plaintiff incorporates by reference the allegations of paragraphs 1 - 100 as though fully set forth herein.

102. The Defendant Harris failed to pay the true value of the assets of Defendant Innoprise in that they purchase all asset save a few items personal to Harward was for far less than their reasonable market value. Harris purchased the Innoprise software, the designs of this software, all the license rights for all the software, all the contracts of customers of Innoprise - both for the software and for service agreements - they purchased the customer list and paid for a non compete. This business was valued by the owner Dennis Harward to be $25,000,000.00 based on the sale and trading in like businesses. Harward has stated that there was over $10,000,000 in contract sales pending at the time.

103. Defendant Harris only paid $3,700,000.00 for the business of Innoprise and its assets. Harris also withheld $400,000 of that purchase price for contingencies.

104. Defendant Harris also provided a promise of royalties on future sales providing Defendant Harward with a projection of $10,820,000 in future payments but had in actuality and without disclosure to Harward projected to the Harris board of directors that there would not be any royalties paid for the three or four years of the obligation under the agreement.

105. Defendants Harris and Harward, including Innoprise, were aware that Innoprise had creditors and specifically Moses.

106. Moses alleges on information and belief that Innoprise had been borrowing money from John Connors and Crusader Investments prior to December 2010 for moneys to pay its current obligations. However, John Connors and Crusader were no longer willing to continue with new loans.

107. Moses alleges on information and belief that Harris was aware of this and took advantage of the situation in negotiating with Harward and Innoprise to agree to pay less than the value of the assets and the business of Innoprise.

108. Thus to obtain the agreement to pay less than the value of the assets of Innoprise Harris negotiated an agreement with a payout to Harward personally through his investment company and to avoid paying the creditors of Innoprise.

109. At the time of the contract of April 29, Harward was an officer of Defendant Harris and constituted an insider.

110. Harris was aware of Harward's personal obligations such as his obligation for taxes and any guarantees he might have had to Connors or Crusader: thus, the payment of the purchase price by Harris was to Harward Investment, wholly owned by Harward, a direct payment to Connors and Crusader.

111. The IRS was paid and then the remaining funds in Harward Investments were taken by Harward and he paid some of his friends who worked with Innoprise.

112. The directing of the funds from the purchase of Innoprises' assets to the personal benefit of Harward, A. Harward, Harward Investment Inc., John Connors, and Crusader Investments was done intentionally by those named parties for the purposes of avoiding, delaying or hindering payment to Mark Moses of the moneys due to him from his employment and services.

113. These acts constituted a fraudulent transfer under the UTFA as embodied in California's Civil Code §3439 et seq.

114. John Connors, Crusader Investment, LLC, Harward Investments,  N. Harris, Harris USA and M. S. Govern were all a part of the negotiations of the April 29 Agreement and were all aware of the obligations of Innoprise as part of the negotiations for the purchase of Innoprise and knew that the funds being transferred were for the benefit of Harward, A. Harward, John Connors, Harward

Investment Inc. and Crusader Investment LLC and also knew that this transfer of funds left Innoprise unable to pay its obligations to Mark Moses; therefore, jointly and in conspiracy with all other defendants, N. Harris and Harris USA did avoid, delay and hinder payment to Mark Moses. Harward told Moses personally on April 29 that Innoprise had no money and could not pay him: this is due to the transfer to a third party, Harward Investment, Inc, of the funds representing the assets of Innoprise which left Innoprise insolvent and without funds to pay its obligations.

115. As a result of their deceit these defendants damaged Moses in the amount of $71,500.00 for services plus $12,500 for penalty under the labor code.

116. Mark Moses seeks to have this court avoid the transfer and payment of proceeds of the purchase of Innoprise as directed to sources other than Innoprise in that said transfers left Innoprise without the assets to pay its debts and the moneys due to Mark Moses. Said transfers by Harward, A. Harward, Innoprise, N Harris and Harris USA were intended to delay and avoid the collection and payment of Mark Moses.

117. Moses is also entitled to exemplary damages in that these acts of defendant were intentional, malicious and intended to defraud, harass and oppress Plaintiff. The amount of which will be amended at trial.

118. Additionally, Moses is entitled to statutory interest on the amount due from April 29, 2011 to date under C. Civ. C. §3289.

Wherefore, Plaintiff seeks the relief set out in the prayer herein.

WHEREFORE, PLAINTIFF PRAYS FOR RELIEF AS FOLLOWS:

Judgment on the First Cause of action as against Defendants Innoprise, Harward, N. Hariss and Hariss USA, as successors in interest to Innoprise; for

1. Damages for failure to pay wages due in the amount of $71,500.00;

2. Damages under C. Labor C. 203 in the amount of $12,500;

3. Interest on all unpaid amounts from April 29, 2011 to date in the amount of 10% per C. Civ. C. §3289 and C. Labor C. 1194.

4. Attorneys' fees as provided under C. Labor C. §218.5

5. Cost of suit incurred herein and

6. Such other relief as the Court deems just and proper.

Judgment on the Second Cause of Action as against Harward and Innoprise; for

1. Damages for breach of contract in the amount of $71,500.00,

2. Statutory interest of 10% on all unpaid amounts from April 29, 2011 under C. Civ. C. §3289,

3. Costs of suit incurred herein, and

4. Such other relief as the Court deems just and proper.

Judgment on the Third Cause of Action as against Harward, A. Harward, Innoprise, N. Harris, and Harris USA:

1. Damages in the amount of $71,500.00, commissions on the May 2011 employment according to proof,

2. Statutory interest thereon,

3. Such other relief as the Court deems just and proper.

Judgment on the Fourth Cause of Action as against Harward, A. Harward, Innoprise, N. Harriss, Harris USA and M. S. Govern; for

1. Damages in the amount of $84,000.00,

2. Statutory interest of 10% on the amount of $84,000 from April 29, 2011 under C. Civ. C. §3289, C. Labor C. §1194; commissions on the May 2011 agreement according to proof.

3. Exemplary damages to accord to proof at time of trial.

4. Costs of suit incurred herein, and

5. Such other relief as the Court deems just and proper.

Judgment on the Fifth Cause of Action as against Harward, A. Harward, Innoprise, N. Harris, and Harris USA, Harward Investments, Inc. and M. S. Govern; for

1. Damages in the amount of $84,000.00.

2. Statutory interest of 10% on this amount from April 29, 2011 under C. Civ. C. §3289;

3. Exemplary damages to accord to proof;

4.  Imposition of a trust in the amount of $84,000, plus the amount of 10% interest from April 29, 2011, on the funds held by Harward, A. Harward, Harward Investments, N. Harris, Harris U.S.A. and M. S. Govern, commission on the May 2011 employment according to proof,

5. Costs of suit incurred herein; and

6. Such other relief as the Court deems just and proper.

Date:  _____          _____

                                           Willis C Silverthorne

**29** | **Complaint**

Verification:

I, Mark Moses, swear under penalty of perjury and the laws of the State of California as follows:

I am the Plaintiff in this matter. The allegations contained in this complaint are true and correct of my own personal except for those matter which have been asserted on belief or information and belief and as to those matters I lack sufficient personal knowledge but believe them to be true.

Date:  8.9.13                                    _____

                                                          Mark Moses

**30** | **Complaint**

Case: Moses v. Innoprise, et. al
PROOF OF SERVICE BY MAIL

I, Willis C Silverthorne, the undersigned hereby certifies and declares under penalty of perjury that the following statements are true and correct:

1.   I am a citizen of the United States, State of California and am over the age of 18 years and am not a party to the within case;

2.   My business address is 220 Bush Street, ste. 962, San Francisco, California, 94104;

3.   On Aug. 9, 2013, I served a true copy(ies) of the attached document(s) titled exactly "Plaintiffs First Amended Complaint"

TO:
MANNER OF SERVICE------**US MAIL:** by placing a true copy of the above described document in the U.S. Mail postal drop on the day set forth herein, and which contained the correct and necessary prepaid postage addressed to the following person(s): Michael Lane, c/o Greenberg Traurig, LLP, 1201 K Street, Suite 1100, Sacramnto, CA. 95814-3938: and, Dennis Harward and Anne Harward, 555 Eldorado Blvd. Broomfield, CO. 80021

Executed this 9th day of August 2013 in the City and County of San Francisco, California.

_____

Willis C Silverthorne

| **Complaint**